FILED & JUDGMENT ENTERED
Steven T. Salata

Jul 25 2013

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

Laura T. Beyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Bankruptcy Case No. 13-30124 |
| MICHAEL JACKSON MATTICK, ) | |
| ) | Chapter 13 |
| Debtor. ) | |
| ) | |

## MEMORANDUM OPINION

This matter came on for hearing on June 4, 2013, on a number of motions and objections relating to the above-referenced Debtor's Chapter 13 bankruptcy plan and petition. Present for the hearing were the Debtor and his counsel Bryan W. Stone; Debra Bryan Mahony ("Ms. Mahony"), attorney-in-fact for creditor Alice A. Bryan ("Ms. Bryan"), and her counsel Heather W. Culp and Christopher J. Culp; Steven G. Tate, the substitute Chapter 13 trustee ("the Chapter 13 Trustee"); and counsel for Regions Bank, James W. Sheedy. Before the Court were Ms. Mahony's Objection to Confirmation, Objection to Exemptions, and Motion to Convert Case, for Cause, to Chapter 7; the Chapter 13 Trustee's Objection of Trustee to Confirmation of Plan and Motion to Dismiss; the Debtor's Motion for Relief from Administrative Order Establishing Procedure for the Disbursement of Post-Petition Conduit Mortgage Payments ("Motion to Exclude Conduit Payment"); and the Debtor's Motion to Voluntarily Dismiss Chapter 13 and

Response to Motion to Convert. The Court announced its decision from the bench on June 5, 2013, and this Memorandum Opinion constitutes its findings of fact and conclusions of law.

Having reviewed and considered the pleadings and other matters of record in the Debtor's bankruptcy case and in the two associated adversary proceedings,[1] as well as the evidence and legal arguments presented at the June 4 hearing, the Court determines that Ms. Mahony's Motion to Convert Case, for Cause, to Chapter 7 should be granted and the Debtor's Motion to Voluntarily Dismiss Chapter 13 should be denied. Further, the Court finds that the Objections to Confirmation of Ms. Mahony and the Chapter 13 Trustee should be sustained; and that Ms. Mahony's Objection to Exemptions should be sustained.

## Findings of Fact

1.  The Debtor voluntarily filed a petition for Chapter 13 bankruptcy relief on January 23, 2013.

2.  Ms. Mahony is the attorney-in-fact for Ms. Bryan pursuant to a power of attorney. Ms. Bryan is the former spouse of the Debtor and is a citizen and resident of Mooresville, Iredell County, North Carolina. Ms. Bryan is also a creditor in the Debtor's case and appears to hold the largest unsecured claim in this case.

3.  The Debtor and Ms. Bryan were married on May 4, 1974 and were separated on October 12, 1993. Two children, both of whom have reached the age of majority, were born of the marriage.

4.  The Debtor and Ms. Bryan entered into a Separation and Property Settlement Agreement on May 5, 1995 ("the 1995 Separation Agreement"). The 1995 Separation Agreement was not made a part of their divorce judgment. At the time that the Debtor entered

---

[1] Mattick v. Bryan, Adv. No. 13-3070, and Mahony v. Mattick, Adv. No. 13-3066.

into the 1995 Separation Agreement, the Debtor knew that Ms. Bryan had been diagnosed with multiple sclerosis, that her disease was chronic, and that, over time, a worsening of her condition was a strong possibility. The 1995 Separation Agreement provides, in pertinent part, as follows:

> 11. Medical Insurance and Payment. The Husband shall continue to provide and pay for major medical and hospitalization insurance for the benefit of the Wife and the parties' children. The Husband's obligation to provide and pay for said insurance shall continue for the Wife indefinitely but shall terminate as to the parties' children as each child attains the age of eighteen (18) years. The Husband shall provide the coverage presently existing for the benefit of the Wife and the parties' children. In the event the Wife remarries, the Husband's obligation to provide this coverage shall cease.
>
> The Husband agrees to reimburse the Wife and the parties' children for any expenses not covered by major medical and/or hospitalization and dental insurance. In this regard, the Husband agrees to maintain a five hundred dollar balance in a special checking account to be opened by the Wife for this purpose.
>
> 23. Specific Performance. Either party shall have the right to compel the performance of the provisions of this Agreement by suing for specific performance in the courts where jurisdiction of the parties and subject matter exists. Should either party be forced to enforce the Agreement by way of a lawsuit for specific performance, then the other party shall be responsible for the payment of the injured party's costs and expenses incurred, including reasonable attorney fees, should the injured party prevail upon his or her lawsuit for specific performance.

5. The 1995 Separation Agreement remains in full force and effect.

6. In July 2002, Ms. Bryan sued the Debtor in the North Carolina General Court of Justice, Mecklenburg County, District Court Division, seeking specific enforcement of paragraph 11 of the 1995 Separation Agreement and attorney's fees. <u>Bryan v. Mattick</u>, No. 02-CVD-11074 (N.C. Dist. Ct. July 2002). The matter was resolved through entry of a consent judgment on November 12, 2002 ("the 2002 Consent Judgment") that was signed by the Debtor and his then-counsel of record. The Mecklenburg County District Court retained jurisdiction to enforce the 2002 Consent Judgment and the 1995 Separation Agreement.

3

7. In 2010, the issue of the Debtor's failure to pay Ms. Bryan's medical insurance and expenses as set forth in the 1995 Separation Agreement was again before the Mecklenburg County District Court as was his failure to abide by the 2002 Consent Judgment. Ms. Bryan filed a motion for enforcement and for contempt, and the Debtor filed a counterclaim seeking a declaration of rights and responsibilities. The 2010 dispute again centered on the Debtor's responsibility under the 1995 Separation Agreement, this time for certain charges not covered in full by either Medicare or major medical insurance. In particular, at issue were certain charges arising from Ms. Bryan's April 2009 removal from her private residence and admission into an assisted living facility upon the advice and direction of her attending physician. The Honorable Jena P. Culler, Mecklenburg County District Court Judge presiding, found that Ms. Bryan's removal from her private residence and admission into an assisted living facility was a medical necessity, and that, on the facts before her, reasonable assisted living expenses were covered under the plain language meaning of "expenses not covered by major medical . . . insurance" in paragraph 11 of the 1995 Separation Agreement. Judge Culler ordered the Debtor to reimburse Ms. Bryan the unpaid uninsured medical expenses owed by him for amounts that had accrued from April 2009 through August 2010, in the amount of $41,475.56, within 12 months. Judge Culler retained jurisdiction to enforce her order as well as the 2002 Consent Judgment.

8. The Debtor appealed Judge Culler's December 2010 order to the North Carolina Court of Appeals. The Court of Appeals affirmed the trial court's order with one exception: it remanded for purposes of amending paragraphs 17 and 18 of the December 2010 Order to address certain "upgrades" for cable and other services. Bryan v. Mattick, 716 S.E.2d 876 (Table), 2011 WL4919340, at *8 (N.C. Ct. App. Oct. 18, 2011) cert. denied, 724 S.E.2d 521

(N.C. 2012).[2]

9.     In June 2012, the Debtor filed a complaint in Mecklenburg County District Court against Ms. Bryan and a prior attorney-in-fact (a son from their former marriage), Mattick v. Bryan, No. 12-CVD-11612 (N.C. Dist. Ct. June 2012), apparently seeking an order requiring Ms. Bryan to repay the sums he had paid since 2002— sums required under the terms of the 1995 Settlement Agreement, the 2002 Consent Judgment, and the December 2010 Order upheld by the North Carolina Court of Appeals with the exception of the narrow issue remanded. The Debtor dismissed the June 2012 complaint, without prejudice, in September 2012.

10.    On August 23, 2012, in the tenth year of the matter of Bryan v. Mattick, the Debtor entered into a Memorandum of Judgment/Order ("the 2012 Consent Contempt Order"), a "consent order finding the Debtor in contempt" of Judge Culler's December 2010 Order. Bryan v. Mattick, No. 02-CVD-11074 (N.C. Dist. Ct. Aug. 23, 2012). It memorializes the Debtor's agreement to:

    a.    purge himself by paying Ms. Bryan $50,000 within 7 days of August 23, 2012;

    b.    pay Ms. Bryan $62,463.37 within 120 days of August 23, 2012;

    c.    pay Ms. Bryan $7,536.63 within 120 days of August 23, 2012; and

    d.    comply with Judge Culler's December 2010 Order.

11.    In compliance with the 2012 Consent Contempt Order, the Debtor paid Ms. Bryan $50,000 within 7 days of August 23, 2012, but made no further payments.

12.    A subsequent contempt hearing was to be held against the Debtor on January 23, 2013 for failure to remit the remaining $70,000. The Debtor's bankruptcy case was filed on the

---

[2] Judge Culler entered an amended order on April 8, 2013, *nunc pro tunc* to June 1, 2012, in accordance with the mandate of the North Carolina Court of Appeals.

same day, shortly before the time set for the contempt hearing.

## Procedural Background

13.   Warren L. Tadlock was duly appointed and acted as Chapter 13 Trustee.  A first meeting of creditors was held on March 7, 2013 and was continued to March 21, 2013.  Steven G. Tate was appointed substitute Chapter 13 Trustee by order entered April 3, 2013.  He conducted the continued meeting of creditors held on April 4, 2013.

14.   The Debtor's Chapter 13 plan is a base plan that proposes to pay $800 per month for 60 months for an estimated payout of 48% to unsecured creditors.  He listed no priority claims, and he indicated on Schedule E, Local Form 7, and amended Local Form 7 that he is not presently required by any voluntary agreement, judicial or administrative order, or statute to pay any domestic support obligation (as defined in 11 U.S.C. § 101(14A)).

15.   The Debtor listed Ms. Bryan on his Schedule F as an unsecured, nonpriority creditor with a disputed $70,000 "property settlement arrearage" claim.  $70,000 is the sum total of the two amounts that the Debtor agreed to pay to Ms. Bryan in order to purge his contempt pursuant to the 2012 Consent Contempt Order.[3]

16.   On April 12, 2013, Ms. Mahony filed an Objection to Confirmation, Objection to Exemptions, and Motion to Convert Case, for Cause, to Chapter 7, pursuant to 11 U.S.C. §§ 1324, 1325, and 1307(c)(11) and Local Bankruptcy Rule 2002-3 ("Objection to Confirmation and Motion to Convert"), alleging that:

   a.   the debt owed to Ms. Bryan is a domestic support obligation and that the

---

[3] The Debtor's Schedule B, item 17, lists a "potential claim against ex-wife for overpayment/charge for prior property settlement obligations" in an "unknown" amount.  At his April 4, 2013 continued meeting of creditors, under questioning by Mr. Tate, the Debtor testified that to his knowledge Ms. Bryan does not owe him anything.

Court is therefore without the statutory authority to confirm the Debtor's plan pursuant to 11 U.S.C. § 1325(a)(8);

      b.    in contravention of 11 U.S.C. § 1322(a)(2), the Debtor's plan fails to provide for the full payment, in deferred cash payments, of Ms. Bryan's priority domestic support obligation claim and that she had not agreed to a different treatment of her claim;

      c.    upon information and belief, the Debtor had substantially undervalued his 100% ownership interest in Mel Jackson Tax Service, Inc. at $9500.00, and that in order to satisfy the requirements of 11 U.S.C. §§ 1329(a)(1), 1329(b)(1), and 1325(a)(4), the Debtor's monthly plan payment would have to increase to an amount that far exceeds his ability to pay based on his disclosed disposable monthly income;

      d.    the Debtor had improperly claimed on Schedule C the exemptions available to North Carolina residents pursuant to North Carolina General Statutes § 1C-1601(a), on the grounds that exempted property remains liable for a domestic support obligation debt during and after the Debtor's bankruptcy pursuant to 11 U.S.C. § 522(c)(1); and

      e.    the Debtor transferred certain real property, in which he held an ownership interest, to a North Carolina limited liability company in which his current wife is the sole member, within two years before the date of the filing of his bankruptcy case, with actual intent to hinder, delay, or defraud Ms. Bryan, to whom he was indebted at the time of the transfer (and at the time of the 2002 transfers of the same property); that such transfers may constitute fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1) and N.C. Gen. Stat. § 39-23.4(a)(1); and that, if such transfers were avoided and the real property liquidated in a Chapter 7 case, there may be net proceeds to pay Ms. Bryan's priority domestic support obligation claim, pay all unsecured creditors, and fund the Debtor's obligations to Ms. Bryan.

17. Importantly, Ms. Mahony alleged in her Objection to Confirmation and Motion to Convert that:

> 40. For the reasons set forth above, and as may be further shown at the hearing on these matters, the Debtor appears to have filed this Chapter 13 proceeding for the sole purpose of evading and defeating the effect of the North Carolina state courts' domestic orders and as part of a decade-long and continuing pattern of evading his obligations to Ms. Bryan.
>
> 41. The Debtor should be denied the ability to dismiss his case under Section 1307(c) of the Bankruptcy Code; further, because of the Debtor's bad faith and fraudulent conduct as described herein and as may be further shown, this case should be converted to a Chapter 7 case for purposes of liquidation. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 374-75, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007) ("Nothing in the text of either §706(a) or 1307(c) . . . limits the authority of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor.")[.]

18. On April 15, 2013, the Chapter 13 Trustee filed his Objection of Trustee to Confirmation of Plan; Motion to Dismiss pursuant to 11 U.S.C. § 1307(c) on the grounds that the Debtor's plan does not comply with the requirements of 11 U.S.C. § 1325(a)(1) and other applicable law.

19. On April 30, 2013, Ms. Mahony, in her capacity as Ms. Bryan's attorney-in-fact, timely filed a complaint against the Debtor objecting to the dischargeability of the debt owed to Ms. Bryan pursuant to 11 U.S.C. § 523(a)(5) and requesting an award of expenses and costs, including a reasonable attorney's fee, pursuant to Federal Rule of Bankruptcy Procedure 7008(b). Complaint at 6 – 7, <u>Mahony v. Mattick</u>, Adversary Proceeding No. 13-3066 (Bankr. W.D.N.C. Apr. 30, 2013).

20. On May 30, 2013, Ms. Mahony timely filed a proof of claim on behalf of Ms. Bryan for a priority debt of $93,367.09 pursuant to 11 U.S.C. § 507(a)(1)(A) or (B).

21. On May 2, 2013, the Debtor timely filed a complaint against Ms. Bryan seeking a determination that the debt owed to Ms. Bryan is a non-domestic support obligation marital debt

8

that is dischargeable upon completion of his Chapter 13 plan.  Complaint at 7 – 10, Mattick v. Bryan, Adversary Proceeding No. 13-3070 (Bankr. W.D.N.C. May 2, 2013).  As part of that adversary proceeding, the Debtor sought to have the Court revisit the issue of whether the residency/assisted living costs incurred by Ms. Bryan were medical expenses for which the Debtor is responsible under paragraph 11 of the 1995 Separation Agreement.  Id. At 4 – 5.  Based on guidance from the Court in a conference with all of the parties at the request of counsel for the Debtor and counsel for Ms. Mahony, the Debtor ultimately conceded that the issue of whether residency/assisted living costs are "medical expenses" covered under paragraph 11 of the Separation Agreement had been sufficiently settled by the state court and the Debtor is barred from re-litigating the same pursuant to the preclusion doctrines and the Rooker-Feldman doctrine.[4]  Consequently, the Debtor also conceded that the debt owed to Ms. Bryan is a nondischargeable domestic support obligation within the meaning of § 523(a)(5) and, therefore, his proposed plan could not be confirmed.  As part of that concession, the Debtor subsequently withdrew his Motion to Exclude Conduit Payment.

22.    The Debtor filed a Motion to Voluntarily Dismiss Chapter 13 and Response to Motion to Convert and argued his absolute and unequivocal right to dismiss pursuant to § 1307(b).  Ms. Mahony, on the other hand, resists the dismissal of this case and seeks to have the Court convert the case pursuant to § 1307(c), which allows the Court to dismiss or convert a debtor's case, whichever is in the best interests of creditors and the estate, for cause.  Therefore, the only remaining issue for determination by the Court at the hearing on June 4, 2013, was whether to

---

[4] The Rooker-Feldman Doctrine prohibits state-court parties from bringing "follow-up actions in federal court for the purpose of complaining of errors and injuries caused by state court judgments and inviting federal court review of those judgments." See In re Walker, 416 B.R. 449, 461 (citing Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 292 (2005)).

dismiss this case pursuant to § 1307(b) or convert it to a Chapter 7 pursuant to § 1307(c).

## Conclusions of Law

23. This Court begins by recognizing that courts across the country are split regarding the issue of whether a debtor has an unequivocal right to dismiss a Chapter 13 case pursuant to § 1307(b) or if such right is qualified in the face of a pending motion to convert under § 1307(c) and allegations of bad faith.

24. In support of his argument that debtors have an absolute right to dismiss this case under § 1307(b), the Debtor cites In re Hamlin, No. 09-05272-8-SWH, 2010 WL 749809 (Bankr. E.D.N.C. Mar. 1, 2010). In Hamlin, Judge Humrickhouse stated, in dicta, that debtors have an absolute right to dismiss a Chapter 13 case under § 1307(b). The Debtor's reliance upon Hamlin, however, is misplaced. Hamlin is easily distinguishable from the case before this Court because in that case no motion to convert had been filed and there was no specific allegation of bad faith by the debtors.

25. There is precedent in this district that limits a debtor's right to dismiss a Chapter 13 case when a motion to convert is pending and it appears that the debtor is exercising that right in bad faith and for an improper purpose. In re Tatsis, 72 B.R. 908, 910 (Bankr. W.D.N.C. 1987) ("When a motion to convert is filed, the Court is placed in a position of having to make a determination in the best interest of all concerned as to whether or not the case should be converted, continued, or dismissed."); In re James, No. 09-11264, 2010 WL 2107428, at *2 (Bankr. W.D.N.C. Apr. 1, 2010) ("A Chapter 13 debtor's right to dismiss or convert a case is … not absolute …. [and] is impressed with the tacit requirement that the exercise of that right be in good faith and not for any improper purpose.").

26. In addition, this Court finds persuasive the analysis in Taylor v. Winnecour, (In re

10

Taylor), 462 B.R. 527, 531 (Bankr. W.D. Pa. 2011), aff'd 460 B.R. 673 (W.D. Pa. 2011), which interprets 11 U.S.C. § 1307(b) as permitting courts to consider "factors such as a debtor's good faith and whether the debtor is using the bankruptcy process in an abusive way, rather than being required to grant a debtor's motion to dismiss regardless of the basis for the debtor's conduct, the status of the proceedings, and the consequences to be borne by creditors."

27.     Although the Fourth Circuit has not specifically ruled on the issue of a debtor's bad faith in the context of the right to dismiss a case under § 1307, it has adopted a fact-specific, totality of the circumstances inquiry into a debtor's good faith.

> While no precise definition can be sculpted to fit the term "good faith" for every Chapter 13 case, we think the generally accepted definition of "good faith" as used in Chapter 11 of the old Bankruptcy Act, 11 U.S.C. § 766(4) (1976) (repealed), provides the general parameters:
>
> A comprehensive definition of good faith is not practical. Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan . . . .

Deans v. O'Donnell, 692 F.2d 968, 972 (4th Cir. 1982), superseded by statute, Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333, as recognized in In re Lemaire, 883 F.2d 1373 (8th Cir. 1989).

28.     The Sixth Circuit has considered the indicia of a debtor's bad faith in determining whether to dismiss or convert a Chapter 13 petition for lack of good faith. Cusano v. Klein (In re Cusano), 431 B.R. 726, 735 (B.A.P. 6th Cir. 2010). In that regard, the Sixth Circuit noted that "'because good faith is an "amorphous notion" it is impossible to identify the "infinite variety" of factors that might weigh in the "good faith equation." A key inquiry, however, is whether the debtor is seeking to abuse the bankruptcy process.'" Id. (quoting Condon v. Brady (In re Condon), 358 B.R. 317, 326 (B.A.P. 6th Cir. 2007)). In addition, various courts have held that some of the

11

factors that may be considered in the context of whether to dismiss or convert a Chapter 13 petition for lack of good faith are:

 a. the timing of the petition;

 b. how the debt arose;

 c. the debtor's motive in filing the petition;

 d. how the debtor's actions affected creditors;

 e. the debtor's treatment of creditors both before and after the petition was filed; Cusano, 431 B.R. at 735;

 f. whether the debtor misrepresented facts in his petition or plan (including failure to disclose assets or debts), unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner;

 g. the debtor's history of filings and dismissals (i.e., multiple filings and dismissals);

 h. whether the debtor intended to defeat state court litigation; Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1224 (9th Cir. 1999);

 i. whether egregious behavior is present;

 j. whether the debtor took advantage of the automatic stay of matters pending against her and caused her creditors to appear in matters before this court and to file actions against her;

 k. whether dismissal would once again force creditors into other courts after the debtor delayed their suits in those courts, which would be a further abuse of process;

 l. whether the debtor's "effort to dismiss the case is the next effort in his litigious past to put his creditors to great expense while side-stepping any real effort to reconcile

or satisfy their [sic] debts";

  m. whether dismissal would result in creditors having expended substantial time, effort, and costs in the ongoing effort to collect on their judgments and the Chapter 13 Trustee, having expended time, effort, and costs in identifying assets and undertaking his statutory duties; and

  n. whether the debtor filed the bankruptcy for the purpose of abusing the bankruptcy process by relitigating matters barred by res judicata or collateral estoppel.  Taylor, 462 B.R. at 533-534.

  29. All of the factors that may be considered in the context of whether to dismiss or convert a Chapter 13 petition for lack of good faith are present in this case, with the exception of a history of multiple bankruptcy filings and dismissals.  Each factor, in isolation, may be insignificant when evaluating whether to dismiss or convert a case for lack of good faith.  However, in this case, under the totality of the circumstances, the Court finds that the Debtor's exercise of his right to dismiss this case is in bad faith and an abuse of process.

  30. As an initial matter, the Debtor failed to list certain assets and debts in his bankruptcy petition and schedules, such as a note receivable in the amount of $62,012.11 for money loaned to Mel Jackson Tax Services, Inc., the Debtor's accounting business; notes receivable in the amounts of $120,249 and $25,000 listed on a financial statement;[5] and a debt to Bank of Granite in the amount of approximately $140,000 as well as one to Regions Bank in the amount of approximately $209,000.  In addition, the Debtor failed to disclose his position as Secretary of AJS Carolina Pest Control, a family corporation, in his Statement of Financial Affairs.

  31. More importantly, the Debtor's sole motive in filing this bankruptcy case was to

---

[5] The Debtor testified that he could not remember if these notes were owed to himself or his wife.

avoid, defeat, and evade the North Carolina state court orders regarding his obligations to Ms. Bryan pursuant to the 1995 Separation Agreement, the 2002 Consent Order, the December 2010 Order, and the 2012 Consent Contempt Order, and the underlying obligation to Ms. Bryan itself. The Debtor voluntarily entered into the 2002 Consent Order and the 2012 Consent Contempt Order, only to file this case on the eve of yet another contempt proceeding in the Mecklenburg County District Court arising from his failure to uphold his obligations in the 1995 Settlement Agreement. The Debtor's filing of a bankruptcy case on the eve of a state court contempt hearing on a domestic support obligation, alone, is indicative of bad faith for purposes of conversion to Chapter 7 and relief from the automatic stay under 11 U.S.C. § 362(d).  See In re Hopper, 474 B.R. 872, 887 (Bankr. E.D. Ark. 2012).

32. Filing this bankruptcy case forced Ms. Bryan to come into this Court and file numerous pleadings in an effort to force the Debtor to pay her amounts the state court had previously determined she was owed pursuant to the 1995 Settlement Agreement. These pleadings include an objection to confirmation, an objection to exemptions, a motion to convert the case to Chapter 7, and an adversary proceeding objecting to the dischargeability of the debt owed to her. Thus, it appears the Debtor filed this bankruptcy case in an effort to put Ms. Bryan at great expense and in order to sidestep any responsibility to her.

33. In addition, Ms. Bryan has been forced to defend against the Debtor's dischargeability adversary proceeding in which the Debtor sought to relitigate all of the determinations made in the North Carolina state courts regarding his obligations to Ms. Bryan. Ultimately, the Debtor conceded that relitigation of the existence, validity, and amount of the debt owed to Ms. Bryan is barred by res judicata and the Rooker-Feldman doctrine.

34. Dismissing this bankruptcy case at this point would simply put Ms. Bryan back in

the Mecklenburg County District Court after six months of unnecessary and expensive delay.  And this Court has serious concerns about the Debtor's intention to further abuse the legal process as a result of his testimony at the hearing on this matter.  Specifically, the Debtor indicated that if this case is dismissed, he may refile the claims against Ms. Bryan and his son that he previously dismissed in the matter of <u>Mattick v. Bryan</u>, No. 12-CVD-11612 (N.C. Dist. Ct.).  Moreover, when asked on cross-examination how he intended to repay the amounts he owes to Ms. Bryan outside of bankruptcy, the Debtor answered that he did not know.   The Debtor testified that he had only two means to pay the debt owed to Ms. Bryan outside of bankruptcy:  by making more money or by selling his home.  A cursory examination of the Debtor's petition and schedules indicates that there is no equity in his primary residence with which to pay Ms. Bryan.  Coupled with his statements about refiling the lawsuit against Ms. Bryan and her son, it is difficult for this court not to conclude that if this case is dismissed, the Debtor plans to continue his efforts to thwart Ms. Bryan in state court.

   35. Finally, based on the record before this Court, it appears there is nothing left for the Mecklenburg County District Court to determine regarding the debt owed to Ms. Bryan by the Debtor.  That issue has been decided by the trial court and affirmed by the North Carolina Court of Appeals.  Therefore, at this point this is a debtor/creditor dispute that can easily be resolved in this forum.  For all of these reasons, the Court finds that the Debtor's exercise of his right to dismiss this bankruptcy case is in bad faith and an abuse of process.

   36. In addition to finding that the Debtor seeks to dismiss this case in bad faith, pursuant to § 1307(c), the Court must also consider whether conversion or dismissal of this case is in the best interest of the Debtor's creditors and the estate.  The Bankruptcy Code does not identify factors for bankruptcy courts to consider when determining what is in the best interests of creditors and the

estate. However, Collier on Bankruptcy, the authoritative bankruptcy treatise, provides guidance.[6] Collier explains that the "parties will be the best judge of their own best interests, and if all of the parties agree on one course of action, the court should accommodate their desire." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[7] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing Arkansas, Inc. v. United States Trustee (In re Camden Ordinance Mfg. Co. of Arkansas, Inc.), 245 B.R. 794, 802 (E.D. Pa. 2000); In re Great Am. Pyramid Joint Venture, 144 B.R. 780, 793 (Bankr. W.D. Tenn. 1992)). Collier then lists ten factors a court should consider when evaluating whether to convert or dismiss a case, including (1) "the ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors"; (2) "whether there would be a loss of rights granted in the case if it were dismissed rather than converted"; (3) "whether any remaining issues would be better resolved outside the bankruptcy forum"; and (4) "whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests." Id. In considering these factors, the court concludes that conversion is in the best interest of the Debtor's creditors.

37.    While this is not a one-creditor case, Ms. Bryan is the only creditor who has appeared and expressed an opinion as to her interest, and she has asked the Court to convert this case to a Chapter 7. In addition, based on the evidence presented by Ms. Mahony, it appears there are potential assets a Chapter 7 Trustee could reach for the benefit of creditors.[7] For example, Larry M. Stiles, a CPA and longtime member of this district's Chapter 7 Trustee Panel, testified that sufficient questions have been raised about the transfer of real property by the Debtor for no consideration to a single-member LLC in which his wife is the sole member to warrant examination

---

[6] While the Collier discussion is in the Chapter 11 context, it is equally applicable to determining the best interests of creditors pursuant to § 1307(c).

[7] See Hopper, 474 B.R. at 887 ("Conversion of this case rather than dismissal is in the best interests of creditors because there are potentially fraudulent or preferential transfers that a Chapter 7 Trustee should investigate …. ").

16

by a Chapter 7 Trustee for possible avoidable transfers under § 548.  Mr. Stiles indicated that if those transfers were avoided, the property would belong to the Debtor's estate and could result in a significant dividend to its creditors.  In addition, Mr. Stiles indicated that there may be potential value in the Debtor's business for the benefit of creditors.  Finally, Mr. Stiles testified that a Chapter 7 Trustee would likely be able to recover quickly for the benefit of the bankruptcy estate the $62,012.11 unscheduled debt that Mel Jackson Tax Services, Inc. owes the Debtor.

38.     As explained above, there are no remaining state court issues that would be better resolved outside the bankruptcy forum.  Ms. Bryan has suffered through years of litigation in state court trying to enforce the 1995 Settlement Agreement with the Debtor and on the eve of a contempt hearing, which according to the Debtor's own testimony would have resulted in his incarceration, the Debtor filed bankruptcy and dragged Ms. Bryan into this case to her great expense.  The Debtor appears to have filed this Chapter 13 proceeding for the sole purpose of evading and defeating the effect of the North Carolina state courts' domestic orders and as part of a decade-long and continuing pattern of evading his obligations to Ms. Bryan.  Now that the parties are here, the court concludes that it would be in the best interest of the creditors of this estate to stop the Debtor's abuse of process, convert the case to a Chapter 7, and have an objective third party, namely the Chapter 7 Trustee, assess the situation and determine what assets are available for distribution to creditors.

39.     As part of her objection to confirmation, Ms. Mahony sought costs, expenses, and a reasonable attorney's fee.  The Court declines to rule on that request, deferring to the Mecklenburg County District Court's judgment on that issue.  In that regard, pursuant to 11 U.S.C. § 362(d)(1), the court *sua sponte* grants Ms. Mahony relief from the automatic stay for the limited purpose of allowing the Mecklenburg County District Court to consider that issue.

Based on the foregoing, it is therefore **ORDERED** that:

1. Ms. Mahony's Objection to Confirmation and Objection to Exemptions are sustained;

2. Ms. Mahony's Motion to Convert Case, for Cause, to Chapter 7 is granted;

3. The Chapter 13 Trustee's Objection to Confirmation is sustained;

4. The Chapter 13 Trustee's Motion to Dismiss is denied;

5. The Debtor's Motion to Voluntarily Dismiss Chapter 13 is denied;

6. The Chapter 13 Trustee, Steven G. Tate, is directed to immediately disburse $2400.00 (or the balance on hand) to Alice A. Bryan, c/o Debra Bryan Mahony, as partial payment of the Debtor's pre-petition domestic support obligation arrearage pursuant to 11 U.S.C. § 507(a)(1)(A);[8] and

7. Pursuant to 11 U.S.C. § 362(d)(1), Ms. Bryan is granted relief from the automatic stay for the limited and sole purpose of obtaining from the Mecklenburg County District Court a ruling regarding whether the Debtor is responsible for payment of Ms. Bryan's costs and expenses, including a reasonable attorney's fee, incurred due to the Debtor's bankruptcy filing.

**This Order has been signed electronically.**     **United States Bankruptcy Court**
**The judge's signature and court's seal appear**
**at the top of the Order.**

---

[8] The Court understands that based on its ruling from the bench on June 4, 2013, the Chapter 13 Trustee previously issued a check to Ms. Bryan in the amount of $3200.00.

18